UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
DENISE GARRETT,

                Plaintiff,

    - against -

PROVIDENT LIFE AND CASUALTY INSURANCE
COMPANY n/k/a UNUMPROVIDENT, INC.; JOHN
DOES 1-5; and ABC CORPORATIONS 1-5,

                Defendants.
----------------------------------------------------------------X

**MEMORANDUM AND
ORDER**
11-CV-133 (RRM) (JO)

ROSLYNN R. MAUSKOPF, Chief United States District Judge.

       Plaintiff Denise Garrett brings this action against defendants Provident Life and Casualty

Insurance ("Provident Life"), John Does 1-5, and ABC Corporations 1-5, under the Employment

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, challenging

Provident Life's termination of disability benefits.  (Comp. (Doc. No. 1) ¶ 31.)  Before the Court

are the parties' cross-motions for summary judgment.  (Plaintiff's Motion for Summary

Judgment ("Pl.'s MSJ") (Doc. No. 47); Defendant's Motion for Summary Judgment ("Def.'s

MSJ") (Doc. No. 48).)  For the reasons set forth below, the motions are denied.

## BACKGROUND

       The undisputed facts of this case are taken from Plaintiff's Local Civil Rule 56.1

Statement ("Pl. 56.1") (Doc. No. 47-3), Defendant's Responses to Plaintiff's 56.1 Statement

(Doc. No. 47-8), Defendant's Local Civil Rule 56.1 Statement ("Def. 56.1") (Doc. No. 50),

Plaintiff's Responses to Defendant's 56.1 Statement (Doc. No. 52), the Administrative Record

("AR") (Doc. No. 46), and Garrett's Supplemental Record ("SR") (Doc. No. 55).

I.      **Factual Background**

a.  **Garrett's Claim Submission**

Provident Life issued a policy of individual disability income insurance to Garrett effective April 1, 1995 (the "Policy").  (Pl. 56.1 ¶ 5.)  The Policy defines "Total Disability" as:

> Total Disability or totally disabled before your 55th birthday or before benefits have been paid for ten years for a period of disability, whichever is later means that due to Injuries or Sickness:
>
> 1. you are not able to perform the substantial and material duties of your occupation; and
>
> 2. you are receiving care by a Physician which is appropriate for the condition causing you disability.  We will waive this requirement when continued care would be of no benefit to you.

(Def. 56.1 ¶ 2.)  "Your occupation" is defined under the Policy as "the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled."  (Def. 56.1 ¶ 3.)

Garrett was employed as an office manager at New York Physical/KMR Rehabilitation. (Pl. 56.1 ¶ 2.)  In February 2001, Garrett filed a claim asserting that she was disabled from her job beginning November 22, 2000.  (Def. 56.1 ¶ 4.)  Garrett reported that she was in a car accident on November 22, 2000, and as a result suffered from numbness in her neck and face, pain in her lower back, both legs, and right shoulder.  (Def. 56.1 ¶ 4.)  On her disability claim form, Garrett told Provident Life that her job involved "supervis[ing] a staff of approx. 25 clerical workers," (Def. 56.1 ¶ 7), and listed her job duties as "posting payment on computer, payroll, billing, staff meetings and administration," (Pl. 56.1 ¶ 15).  Garrett's former assistant, Javeer Torres, filled out Garrett's employer questionnaire, which described Garrett's duties as "Payroll, Posting of Payments in Computer, Conducting staff Meetings, Billing in Computer, All

2

Administrative Duties, Handling all problems with attorneys and patients."  (Pl. 56.1 ¶ 22; Def.

56.1 ¶¶ 8–9.)

Garrett provided Provident Life with an attending physician's statement from Dr.

Osafratu Opam, who was a physician in the group rehab practice where Garrett worked.  (Pl.

56.1 ¶ 14; Def. 56.1 ¶ 5.)  Dr. Opam's February 12, 2001, report documented Garrett's reported

symptoms, which included pain in her neck, back, and right shoulder, and headaches

immediately following the accident.  (Pl. 56.1 ¶ 18.)  Dr. Opam noted that Garrett was seen at the

hospital and was discharged to the care of her doctors.  (Pl. 56.1 ¶ 18.)  Dr. Opam reported that

Garrett complained of the following: "headaches, facial muscle pain, neck pain/stiffness

radiation down right shoulder, difficulty sleeping and lifting, lower back pain aggravated by

lifting, changing positions and bending, numbness and tingling down right side of face and right

shoulder, shooting pains down right arm, difficulty standing, bending and walking, and right

shoulder pain."  (Pl. 56.1 ¶ 18.)  Dr. Opam found that Garrett had a decreased range of motion

and weakness in the cervical and lumbar spine, and right shoulder.  (Pl. 56.1 ¶ 19.)  Dr. Opam

concluded that Garrett's disabling medical conditions were from the car accident.  (Pl. 56.1 ¶

18.)  He diagnosed her with disc herniation at L5-S1, C3-4, C4-5, C5-6, and C6-7, and right

shoulder internal derangement.  (Pl. 56.1 ¶ 18.)  Dr. Opam based his diagnosis of Garrett with

disc herniation on MRIs conducted at Ultra Diagnostics Imaging.  (Pl. 56.1 ¶ 17.)  Garrett

provided the MRIs to Provident Life and Provident Life disputes the findings of the MRIs.  (Pl.

56.1 ¶ 17; Def. Resp. to Pl. 56.1 ¶ 17.)

On February 13, 2001, Provident Life conducted a "Claimant Telephone Interview" with

Garrett in which she advised that her role as an office manager required her to sit at a computer

for 90% of the day.  (Pl. 56.1 ¶ 20.)  On February 14, 2001, Dr. Harry Citronenbaum performed

electrodiagnostic testing, which showed lumbar radiculopathy, L4-5 lumbar dysfunction, cervical radiculopathy, post-traumatic myofascitis, and cervical disc dysfunction.  (Pl. 56.1 ¶ 50.)  On February 19, 2001, Dr. Opam conducted somatosensory testing of Garrett's upper and lower extremities, which he interpreted as abnormal.  (Pl. 56.1 ¶ 21.)  An EEG was also conducted on February 19, 2001, which was interpreted as "abnormal and consistent with structural disorder." (Pl. 56.1 ¶ 21.)  Provident Life disputes Dr. Opam's interpretation of the somatosensory testing. (Def. Resp. to Pl. 56.1 ¶ 21.)

**b.  Provident Life's Initial Approval of Benefits**

On March 15, 2001, Provident Life accepted Garrett's claim and began paying $3,450 monthly.  (Pl. 56.1 ¶ 24; Def. 56.1 ¶ 10.)  On March 30, 2001, Nurse Theresa Dick, a clinical consultant, reviewed Garrett's MRI reports and concluded that the medical findings "could support reports of limited ability to bend, lift & walk or stand for extended periods of time without changing position.  It could also support finding of (R) leg symptomatology, however the cause of the (L) leg symptoms are not clear to me at this time."  (Def. 56.1 ¶ 11; AR209.) Nurse Dick noted that "the findings related to Ms. Garrett's cervical spine & (R) shoulder could support reports of limited ability to lift, carry, reach, push, or pull."  (Def. 56.1 ¶ 12.)  She also stated that Garrett "has been participating in a formal PT program with 'slow improvement obtaining progressive general relief of symptoms' as documented by Dr. Opam in his 2/12/01 letter."  (Def. 56.1 ¶ 12.)  Nurse Dick reviewed the MRI reports that Garrett supplied to Provident Life and observed that Garrett's doctors amended the diagnostic report upon multiple reviews but there was "no notation anywhere indicating that the last 2 copies were amended." (Def. 56.1 ¶¶ 14–15.)

4

Pursuant to the terms of the Policy, Garrett completed monthly statements describing her activities.  (Pl. 56.1 ¶¶ 25–26.)  Garrett's March 13, 2001, statement described her activities as mostly staying at home and doing chores with assistance.  (Pl. 56.1 ¶ 26.)  Dr. Opam, who filled out the attending physician's statement portion of Garrett's monthly statement, stated that Garrett's "prognosis to full and complete recovery is guarded at this time."  (Pl. 56.1 ¶ 26.)

In April 2001, an investigator working for Provident Life interviewed Garrett.  (Def. 56.1 ¶¶ 17–18.)  The investigator observed that Garrett walked with a shuffled gait, dragging her left leg, but did not appear to be suffering from any neck or back discomfort.  (Def. 56.1 ¶ 18.)  Garrett told the investigator that she used a cane "when in public" and that "her left leg tends to go out on her and when it does she has to drag it as she walks."  (Def. 56.1 ¶ 19.)  Garrett reported that she could not drive so she relies on family members or car services to take her to her PT appointments.  (Pl. 56.1 ¶ 35.)  Garrett also told the investigator that she "currently treats [sic] in Dr. Opam's office four times a week mainly receiving heat packs and electro stimulation."  (Def. 56.1 ¶ 20.)  The investigator also interviewed Dr. Opam who said that he examines Garrett monthly and that she is "unable to type due to her c[ervical]-spine restrictions, and unable to sit at length due to her lower back limitations."  (Def. 56.1 ¶¶ 21–22.)  The investigator reported that Dr. Opam said that Garrett remained totally disabled.  (Pl. 56.1 ¶ 30.)  The investigator concluded his report with the following:

> The insured's medical records appear to support a total disability with respect to her occupation.  I do however have some reservations regarding the actual extent of her limitations.  We may want to consider performing a surveillance to observe her limitations and to monitor her activity.

(Pl. 56.1 ¶ 38.)

Garrett's May 2001 monthly statement was consistent with her prior statements.  She was able to do chores with assistance and Dr. Opam reported that Garrett remained totally disabled because of her disc herniations, right shoulder injury, headaches, and neck, back and right shoulder pain.  (Pl. 56.1 ¶ 32.)  In June, Garrett underwent surgery to repair her right rotator cuff.  (Pl. 56.1 ¶ 39.)  Garrett's monthly statements continued to report the same symptoms.  (Pl. 56.1 ¶¶ 40–46.)  In a November 14, 2001, attending physician statement, Dr. Opam reported that he was seeing Garrett monthly and Garrett's "limitations" were lifting/bending/carrying/prolonged walking.  (Def. 56.1 ¶ 23.)

On January 21, 2002, Nurse Carolyn Guertin conducted a clinical medical review of the claim file at the request of Dawn Doud, an Associate Customer Care Specialist at Provident Life.  (Pl. 56.1 ¶¶ 52–53; AR98–102.)  She found that the restrictions and limitations indicated by Dr. Opam "appear consistent with the medical record information provided at this time."  (Pl. 56.1 ¶¶ 52–53.)  She believed that Garrett was receiving appropriate medical treatment.  (Pl. 56.1 ¶¶ 52–53.)

Between January and May 2002, Garrett's monthly statements consistently reported chronic pain, muscle spasm, and facial numbness.  Her activities had not changed, and Dr. Opam confirmed that there was no change in her medical conditions or restrictions and limitations.  (Pl. 56.1 ¶¶ 47, 54–57.)  By May, she reported that she could do some household chores and only needed assistance "sometimes."  (Pl. 56.1 ¶ 58.)  Garrett told Provident Life that her ability to work was impeded by "constant chronic pain, muscle spasm, pain in [her] neck, lower back and right shoulder.  Shooting pain from [her] hand to [her] elbow.  Facial numbness, left leg tingling and numbness."  (Def. 56.1 ¶ 24.)

Also in May 2002, Provident Life's investigator conducted another field visit and noted that Garrett "limped as she walked in a side-to-side manner favoring her left leg which appeared to drag somewhat." (Def. 56.1 ¶¶ 25–26.) The investigator reported that Garrett's "torso, shoulders, and arms have a toned athletic appearance." (Def. 56.1 ¶ 27.) Garrett told the investigator that her lower back pain prevented her from standing or walking more than thirty minutes or sitting in the same position more than fifteen minutes. (Pl. 56.1 ¶ 60; Def. 56.1 ¶ 29.)

On May 20, 2002, the Social Security Administration notified Garrett that she did "not qualify for benefits on this claim" because she was "not disabled under [Social Security Administration] rules." (AR188.) The letter explained that Garret's claim was denied because her "condition is not severe enough to keep [her] from working." (AR190.) The letter also notified Garrett that she had the right to appeal. (AR189.)

In the summer of 2002, Garrett had two independent medical examinations ("IME") for unrelated insurance disputes in connection with her car accident. (Def. 56.1 ¶ 30.) Dr. Michael Katz, an orthopedic surgeon, concluded that Garrett's "right shoulder has been essentially restored to normal" and that Garrett "has no permanence [of disability] with regard to the neck." (Def. 56.1 ¶¶ 31–32.) Regarding Garrett's left foot, Dr. Katz had "difficulty with this constellation of symptoms since the MRI [report] of the lumbosacral spine indicates disc herniations pressing on the opposite side. . . . The exact reason for the cavus foot, the clawing of the toes and the foot drop is still something of a mystery." (Pl. 56.1 ¶ 69; Def. 56.1 ¶ 32.) Dr. Katz was also "perplexed" by Garrett's gait, observing: "[T]his lady has seen so many doctors and … this condition, which is affecting her gait, is not mentioned in any of the records." (Def. 56.1 ¶ 33.) Dr. Katz was also "perplexed . . . that the findings on the EMGs for the upper extremities and the lower extremities are exactly the same." (Def. 56.1 ¶ 33.)

The second IME was conducted by Dr. Ira Turner, a neurologist.  (Def. 56.1 ¶ 35.)  Dr. Turner reviewed Dr. Opam's Somatosensory Evoked Potential tests and noted that these studies of the upper extremities and lower extremities made "no sense."  (Def. 56.1 ¶ 36.)  Dr. Turner found that Dr. Opam's EMG reports "reveal more questions than answers" and noted that several reports "only describe musculoskeletal pain" and "did not contain anything resembling a neurological exam."  (Def. 56.1 ¶¶ 37–38.)  Dr. Turner reviewed the MRI reports and "strongly advised" that an independent neuroradiological review of the MRI study be conducted "due to the striking lack of correlation."  (Def. 56.1 ¶ 39.)  He then examined Garrett, and found "an exaggerated antalgic gait" and normal strength "[e]xcept for give-way type 'weakness' of the entire left lower extremity in a nonanatomic distribution."  (Def. 56.1 ¶ 40.)  Dr. Turner concluded that Garrett had no disabilities and found the electrodiagnostic studies "technically suspect."  (Def. 56.1 ¶¶ 42–43.)

Garrett continued submitting monthly statements reflecting that her pain and daily activities were unchanged and Dr. Opam continued to note these symptoms in the attending physician's statement.  (Pl. 56.1 ¶¶ 62–64, 70, 73.)

### c.  Provident Life Continues to Evaluate Garrett

In May 2003, Dr. Howard Baum, an orthopedic surgeon, examined Garrett.  (Def. 56.1 ¶ 44.)  He reported that Garrett was "neurovascularly intact in both upper and lower extremities with normal sensory exam and no atrophy."  (Def. 56.1 ¶ 44.)  Dr. Baum diagnosed cervical and lumbar radiculopathies and found that Garrett's "cervical and lumbar range of motion were restricted to 2/3rd of normal on all plan[e]s."  (Pl. 56.1 ¶ 78.)  Garrett returned to Dr. Baum on July 2, 2003, and August 6, 2003, complaining of increasing left knee pain.  (Pl. 56.1 ¶ 79.)

On August 11, 2003, Garrett was notified of her successful Social Security Administration appeal.  (AR1161.)  Administrative Law Judge Jane Polisar disagreed with the initial determination and found that Garrett "has been disabled within the meaning of the Social Security Act since November 22, 2000, the alleged date of the disability onset."  (Pl. 56.1 ¶¶ 107–09; AR1161.)  She found, among other things, that Garrett's allegations of lower back pain, right shoulder pain, and neck pain were supported by the record.  (Pl. 56.1 ¶¶ 107–09.)  Provident Life did not receive Judge Polisar's decision until a later date.  (Pl. 56.1 ¶ 107.)

Provident Life's investigator interviewed Garrett again on August 25, 2003.  (Def. 56.1 ¶ 46.)  The investigator reported that Garrett "walked in a slow and uneven manner dragging her left leg."  (Def. 56.1 ¶ 44.)  Garrett discussed her continued pain with the investigator and claimed she remained totally disabled because she was "unable to sit at her desk for extended periods, talk excessively on a telephone, perform data entry, perform filing, and supervise an office staff."  (Pl. 56.1 ¶ 76.)  The investigator suggested "performing a surveillance at some point in an effort to observe her day-to-day limitations."  (Pl. 56.1 ¶ 77.)

On October 3, 2003, Garrett had knee surgery for an internal derangement of the left knee.  She was diagnosed with a fracture of the medial femoral condyle and lateral pressure syndrome after surgery.  (Pl. 56.1 ¶ 81.)

### i. Dr. Krishna's Examination

On December 12, 2004, Dr. Ragna Krishna, a neurologist and one of Garrett's treating physicians, performed a neurological examination on Garrett and noted that she had restricted range of motion in both the cervical and lumbar spine and decreased sensation in the outer left leg and left arm.  (Pl. 56.1 ¶ 88.)  Dr. Krishna concluded that Garrett's "clinical findings are consistent with a persistent neuropathic pain syndrome secondary to her trauma of November 22,

2000." (Pl. 56.1 ¶ 88.)  Dr. Krishna confirmed the presence of chronic left C5-C6 cervical

radiculopathy and chronic L5-S1 lumbosacral radiculopathy based on EMG testing performed on

November 19, 2004.  (Pl. 56.1 ¶ 99.)  Included in Dr. Krishna's records was an MRI report of the

lumbar spine that showed a posterior disc bulge at L4-L5, mild narrowing of the spinal canal at

L5-S1, and a slightly right-sided disc herniations at L5-S1.  (Pl. 56.1 ¶ 100.)

### ii.  Additional Examinations, Record Reviews, and Investigation

On January 22, 2005, one of Garrett's treating physicians reported that Garrett continued

to suffer from disc herniation at C3-C7, disc herniation at L5-S1, cervical radiculopathy, and left

leg numbness, among other things.  (Pl. 56.1 ¶ 87; AR648.)  Garrett completed monthly

statements for each month in 2004.  (Pl. 56.1 ¶ 86.)  In those statements, she continued to report

pain in her lower back, right shoulder, and left knee, left leg numbness with curling toes, and

tingling in both legs.  (Pl. 56.1 ¶ 86.)

On September 5, 2005, Garrett saw Dr. Baum and complained of right hip pain.  (Pl. 56.1

¶ 106.)  In September 2005, Nurse Raquel Hills reviewed the medical evidence in Garrett's file

at the request of Provident Life, including the IME reports of Drs. Katz and Turner.  (Def. 56.1 ¶

50.)  Nurse Hills reported "significant inconsistencies in physical exam findings available for

review, lack of updated diagnostic studies, questionable treatment from the insured's providers

as well as lack of clarity regarding the insured's current level of functioning."  (Def. 56.1 ¶ 51.)

Nurse Hills referred the file for medical peer review, which was performed in October 2005 by

Dr. Joel Saks, an orthopedic surgeon who was the Vice President/Associate Medical Director for

UnumProvident (now Provident Life).  (Pl. 56.1 ¶ 94; Def. 56.1 ¶¶ 52–53.)  Dr. Saks spoke with

Garrett's neurologist, Dr. Krishna, who confirmed to Dr. Saks his findings that Garrett showed

increasing atrophy in her left leg and arm since his initial examination on November 19, 2004.

(Pl. 56.1 ¶ 96.)  Nevertheless, Dr. Saks reported that Garrett "has multiple complaints throughout her body not substantiated by objective findings."  (Def. 56.1 ¶ 54.)  He noted that the "electrodiagnostic studies are questionable, according to IME of Dr. Turner, who recommended independent re-review of MRI studies" and that there were "variable findings about the left leg and foot which are not explainable by imagining studies or normal anatomical pathways."  (Def. 56.1 ¶ 55.)  He suggested that additional data from observers and an "activities check" would be helpful.  (Def. 56.1 ¶ 57.)

Provident Life's investigator interviewed Garrett again on October 19, 2005.  (Def. 56.1 ¶ 58.)  He observed that her gait was "uneven, but fairly swift."  (Def. 56.1 ¶ 59.)  Garrett told the investigator that her chronic pain through her neck was persistent, and that she experienced shooting pain into her shoulder, chronic pain across her lower back, and sciatic pain through both legs.  (Def. 56.1 ¶ 60.)  Garrett also told the investigator that she developed a locking sensation within the right hip and consulted Dr. Baum, who prescribed a right hip MRI and bone density exam.  (Pl. 56.1 ¶ 91.)  Dr. Baum advised that bones within the right hip were rubbing but could be improved through "arthroscopy."  (Pl. 56.1 ¶ 91.)  Garrett scheduled the surgery for October 20, 2010.  (Pl. 56.1 ¶ 91.)  Garrett continued to complain of pain in her neck, shoulder, and lower back, and sciatic pain through both legs.  (Pl. 56.1 ¶ 91.)

Provident Life conducted an "activities check" by obtaining surveillance of Garrett on October 18–21, 2005, for ten hours each day.  (Pl. 56.1 ¶ 92; Def. 56.1 ¶ 61.)  The investigator observed and filmed Garrett engaged in numerous activities with no apparent signs of an abnormal gait or pain, including walking up her porch steps, carrying empty water-cooler bottles, using her left arm to pull an empty garbage can, carrying several plastic grocery bags in her left hand, and carrying grocery bags up her porch steps.  (Def. 56.1 ¶¶ 62–71.)

On January 23, 2006, Nurse Sandra Thibeault performed a review of Garrett's file and the surveillance footage at the request of Provident Life.  (Pl. 56.1 ¶ 102; Def. 56.1 ¶ 72.)   Nurse Thibeault confirmed that the EMG/NCS studies done by Dr. Krishna note chronic C5-6 and L5-S1 radiculopathies.  (Pl. 56.1 ¶ 103.)  Nurse Thibeault noted that the restrictions and limitations placed on Garrett might be appropriate but found that Garrett's statements to doctors and Provident Life's investigator were "inconsistent with the level of activity noted during activity check."  (Pl. 56.1 ¶ 103; Def. 56.1 ¶ 73.)

In June 2006, Garrett submitted a statement from Dr. Krishna indicating the following restrictions and limitations: "pushing, pulling, lifting, stooping, prolonged sitting & standing." (Def. 56.1 ¶ 75.)  Dr. Saks again reviewed Garrett's file and concluded that it did "not provide adequate information to assess status.  Insured's statements to investigator were inconsistent with surveillance observations.  Insured is seen to have significant capability for multiple activities. … IME would be helpful to assess status."  (Def. 56.1 ¶¶ 76–77.)

Provident Life's investigator surveilled Garrett on July 17–19, 2006.  (Pl. 56.1 ¶ 112; Def. 56.1 ¶ 78.)  The surveillance revealed Garrett moving without any apparent signs of pain or difficulty.  (Def. 56.1 ¶ 79.)  The investigator saw Garrett: walk onto her pool deck and bend at the waist to vacuum her pool, hold a baby (including with her left arm), carry bags from the grocery store, and walk without a limp.  (Def. 56.1 ¶¶ 80–85.)  Provident Life collected additional surveillance of Garrett on September 27–29, 2006.  (Pl. 56.1 ¶ 114; Def. 56.1 ¶ 103.) The investigator saw Garrett walking, running across the street, and lifting bags and other items without any apparent pain.  (Def. 56.1 ¶ 104.)

### iii.  Dr. Anant's IME

On September 28, 2006, Dr. Ashok Anant, a neurosurgeon, performed an IME of Garrett at Provident Life's request.  (Def. 56.1 ¶ 86; AR1544.)  Garrett told Dr. Anant that she was "able to sit and stand for 45-60 minutes [and] able to drive for short distances."  (Def. 56.1 ¶ 87.)  Dr. Anant examined Garrett and found that Garrett's "cervical spine movements are normal in flexion, extension, lateral rotation, and lateral tilt."  (Def. 56.1 ¶ 88.)  Dr. Anant observed "voluntary limitation" of lumbar spine flexion and found "no foot-drop or foot dorsiflexor or plantar flexor weakness. … Her gait is intact, but she keeps her toes flexed on the left side, which does make her limp from time to time on the left leg.  When she wears sneakers and walks on level ground, there is no limp."  (Def. 56.1 ¶¶ 90–91.)  He further found her neurological examination to be normal and found the results of the EMG, EEG, nerve conduction velocity testing, and SSEP testing to be suspect.  (Def. 56.1 ¶¶ 92–94.)  Regarding Garrett's left foot, Dr. Anant found that her "cavus deformity and 'spasms' has [sic] no correlation with the patient's MRI scan findings or with the results of EMG testing.  I believe this is a functional component or the patient is malingering."  (Def. 56.1 ¶ 95.)  Dr. Anant reviewed the surveillance footage collected by Provident Life's investigator and noted that it showed that Garrett "is not limited in any specific way with regard to daily activities.  The videotapes reveal that she did not guard any movements of her cervical or lumbar spine and was able to perform fairly significant manual physical tasks without limitations. … This would go along with my neurological examination, which indicates no significant motor or sensory abnormalities."  (Def. 56.1 ¶ 96.)  Dr. Anant concluded that Garrett was not disabled and was capable of performing tasks that she would be expected to perform as an office manager.  (Def. 56.1 ¶ 97.)  At a later date, Provident Life provided Garrett's 2000 MRIs to Dr. Anant.  He found the MRI of the lumbar spine "essentially normal except for mild degeneration of the L5-S1 disc space" and the cervical MRI to be

13

completely "normal." (Def. 56.1 ¶¶ 100–01.) He stated that he was "unable to review the MRI of the right hip" because it was "out of his area of expertise." (AR1644.) Dr. Anant disagreed with the report from Garrett's 2000 MRI of the cervical spine the found herniated discs at C3-4, C4-5, C5-6, and C6-7. (AR1644.) Dr. Anant found the quality of the cervical spine MRI "certainly not good enough to make a comment about neural foraminal stenosis" and in his opinion there was "no significant disc herniation at any of these levels." (AR1644.)

On October 25, 2006, Dr. Saks reviewed Dr. Anant's IME report and the surveillance footage. (Def. 56.1 ¶¶ 105–06.) He summarized the footage as follows: "[I]nsured was observed to be carrying out an active lifestyle. She was observed walking, cleaning the pool, lifting the baby, swimming. . . . At no point did she appear to have any self-imposed restrictions or difficulties with these activities." (Def. 56.1 ¶ 106.)

Dr. Saks sent Dr. Anant's IME report to Garrett's treating physician, Dr. Krishna. (Def. 56.1 ¶ 107.) On October 26, 2006, Dr. Saks and Dr. Krishna spoke on the phone regarding Garrett. (Def. 56.1 ¶ 108.) Dr. Krishna told Dr. Saks that he had not reviewed Dr. Anant's IME report. (Def. 56.1 ¶ 110.) Dr. Krishna told Dr. Saks that Garrett "needs a cane to walk and ambulates with an antalgic gait. She cannot put full weight on the left leg and walks with difficulty . . . [and] limps badly." (Def. 56.1 ¶ 109.) Dr. Krishna told Dr. Saks that Garrett had radiculopathy in her left leg and could only sit for hour-long periods without needing to stand or lie down. (AR1555.) Dr. Saks memorialized their conversation in a letter to Dr. Krishna, which Dr. Saks asked Dr. Krishna to amend, if necessary, and sign to indicate that the letter accurately reflected their conversation. (Pl. 56.1 ¶ 119; Def. 56.1 ¶ 108.) On November 7, 2006, Dr. Krishna returned a copy of the letter on which he wrote that Garrett "was not fit for gainfull [sic] employment." (Pl. 56.1 ¶ 120; Def. 56.1 ¶ 112; AR1559.)

14

### iv.  Dr. Katz's IME

On March 14, 2007, Provident Life wrote to Garrett to advise her that they would

conduct a second IME and to advise her of Dr. Anant's opinion that she had no disability.  (Pl.

56.1 ¶ 125; AR1683–88.)  Among the numerous records that Provident Life provided to Dr. Katz

for his review was the surveillance Provident Life's investigator collected.  (Pl. 56.1 ¶ 128;

AR1685–86.)  On April 11, 2007, Dr. Katz examined Garrett again and performed an IME at the

request of Provident Life.  (Pl. 56.1 ¶ 126; Def. 56.1 ¶ 113.)  Dr. Katz reported that Garrett

walked into and out of the examination normally and without the use of a cane.  (Def. 56.1 ¶

114.)  He found that Garrett had "excellent mobility about her spine" and that there were no

"ongoing limitations in walking, standing, sitting or stooping."  (Def. 56.1 ¶¶ 115–16.)  Dr. Katz

concluded that Garrett was "capable of employment as an office manager."  (Pl. 56.1 ¶ 128; Def.

56.1 ¶ 117.)

Provident Life's investigator obtained additional surveillance on April 10–12, 2007.  (Pl.

56.1 ¶ 130; Def. 56.1 ¶ 118.)  The investigator observed Garrett limping as she left her

appointment with Dr. Katz and walking without a limp as she exited her car at her home.  (Def.

56.1 ¶ 119.)

### d.  Provident Life Terminates Garrett's Benefits

On May 11, 2007, Provident Life notified Garrett that it was terminating her benefits

under the Policy.  (Pl. 56.1 ¶ 135; Def. 56.1 ¶ 120.)  The letter reprints the definitions of "Total

Disability" and "Your Occupation" as they appear in the Policy.  (Def. 56.1 ¶ 121.)  After

detailing recent reported symptoms from Garrett's monthly statement and Dr. Krishna's

restrictions, "no lifting, pulling or pushing," the letter states that Provident Life has "observed

your level of activity over the past year, and it appears inconsistent with the restrictions and

limitations you are claiming." (Pl. 56.1 ¶ 135.) The letter notes that while Garrett was awarded Social Security Disability Income ("SSDI") benefits, the SSDI file "did not contain any investigations into your activities, nor did it contain recent medical documentation, . . . the information contained in our IME reports, the auto carrier IME reports, or the results of our investigations into your activities, none of which support your claim for benefits." (Def. 56.1 ¶ 122.) The letter concludes: "The medical records contained in your file, the results of our investigations, and the results of the IMEs performed by Dr. Anant and by Dr. Katz do not support a condition which would preclude you from performing the material and substantial duties of your pre-disability occupation as an Office Manager." (Def. 56.1 ¶¶ 123–24.) The letter notified Garrett of her right to appeal the termination. (Def. 56.1 ¶¶ 125–26.)

### e.  Garrett's Appeal of Provident Life's Termination of Benefits

Although Provident Life provided Garrett with her claim file, that file did not include Provident Life's surveillance video or investigatory report. (Pl. 56.1 ¶ 138.) On July 10, 2007, Garrett's counsel requested the surveillance and investigatory materials from Provident Life, but Provident Life responded that Garrett was not entitled to the requested materials. (Pl. 56.1 ¶ 139.) Garrett disputes the legitimacy the appeal process despite her technical appeal on August 27, 2007, in light of Provident Life's refusal to provide the surveillance footage and investigatory materials and contends that she was precluded from preparing an appeal without those materials. (Pl. 56.1 ¶¶ 140–41; Def. 56.1 ¶¶ 125–26.) Garrett's attorney did not provide additional medical evidence or argument regarding her claim and only technically appealed "under protest." (Pl. 56.1 ¶ 140; Def. 56.1 ¶ 127.)

For the appeal, Provident Life obtained peer review from Dr. Charles Sternberg, a neurosurgeon. (Def. 56.1 ¶ 128.) Dr. Sternberg criticized Garrett's medical evidence and agreed

with Dr. Anant that the 2000 MRI images "do not correlate" with the radiology reports.  (Def. 56.1 ¶¶ 129–30.)  Dr. Sternberg found no "evidence of credible anatomical injury" from the accident and found that the surveillance demonstrated Garrett's "consistent ability to move with a fluid and normal gait and to engage in a variety of active physical activities without apparent discomfort."  (Def. 56.1 ¶¶ 131–32.)  Dr. Sternberg concluded that there were no restrictions or limitations preventing Garrett from "full time light work activities."  (Def. 56.1 ¶ 133.)

Dr. Isadore Yablon, an orthopedic surgeon, also provided a peer review of Garrett's records.  (Def. 56.1 ¶ 128.)  Dr. Yablon reviewed the medical evidence and surveillance footage and concluded that there was "no evidence" that Garrett "is suffering any impairment at present . . . . She is able to return to her usual work as an office manager at any time without restrictions."  (Def. 56.1 ¶ 134.)

On October 29, 2007, Provident Life notified Garrett that it completed its review and was upholding its termination of her benefits.  (Def. 56.1 ¶ 135.)  On July 21, 2008, Provident Life sent Garrett's attorney the entire claim file including all of the surveillance material, acknowledging that Garrett's claim was "governed by ERISA" and that Garrett was entitled to the full file.  (Pl. 56.1 ¶ 143.)

### f.  Garrett's Social Security Administration Claim

In addition to providing Garrett with the surveillance footage, Provident Life also provided the Social Security Administration with the surveillance footage.  (Pl. 56.1 ¶ 147.)   In May 2009, the Social Security Administration terminated SSDI benefits, stating that Garrett's "condition improved" and "does not prevent [her] from returning to work."  (Def. 56.1 ¶ 145.) The SSDI determination was based at least in part on a March 30, 2009, IME by Dr. Jerome

Caiati, an orthopedist, who concluded that Garrett could "sit unrestricted.  Stand or climb with minimal limitation due to left knee pain. . . ."  (Def. 56.1 ¶¶ 146–47.)

Garrett challenged the Social Security Administration's denial of benefits and a Disability Hearing was held on December 11, 2009.  (Pl. 56.1 ¶ 147; Def. 56.1 ¶ 148.)  The decision reflects that the NYS Insurance Fraud Bureau investigated Garrett:

> The claimant was observed entering the premises of Phys Therapy and Chiro Cent.  She was seen entering on 4 occasions during 5-08 during office and nonoffice hours when the facility was not open to patients.  They concluded that she may be working at this location.  NYS Insurance Fund [sic] referred the case to the SSA Inspector General.  The doctors at the same Phys Therapy and Chiro Cent. were interviewed about the claimants [sic] relationship with them and they refused to answer questions and retained counsel.

(Def. 56.1 ¶ 149; SR471.)  Garrett denied that she was working at Phys Therapy and Chiro Cent. and claimed to have been visiting a friend.  (Def. 56.1 ¶ 150.)  On May 25, 2010, the Social Security Administration concluded that Garrett was disabled and her benefits should continue, in part because the investigation was "inconclusive and does not clearly document that the claimant is working."  (Def. 56.1 ¶ 151; SR463–78.)

### g.  Garrett's Guilty Plea

On January 6, 2015, Garrett pleaded guilty to Petit Larceny in the Criminal Court of the City of New York, Kings County, in connection with an unrelated matter.  (Def. 56.1 ¶ 153.)  The crime involved an insurance fraud wherein Garrett falsely notified Guardian Life Insurance Company of America ("Guardian") that a relative had died and that she was the guardian of juveniles who were beneficiaries of a life insurance policy.  (Def. 56.1 ¶ 155.)  Garrett requested that all future correspondence be directed to her and transferred the proceeds of the policy, $232,934.02, into her own account.  (Def. 56.1 ¶ 155.)  Garrett was ordered to pay restitution of the $232,934.02.  (Def. 56.1 ¶¶ 156–57.)

## II.     Procedural History

On August 6, 2010, Garrett filed this lawsuit against Provident Life in New York Supreme Court, Kings County.  (Complaint (Doc. No. 1).)  On January 10, 2011, Provident Life removed the case to this Court pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).  (Notice of Removal (Doc. No. 1).)

On March 14, 2011, the parties entered into a stipulation, which provided that ERISA governs the Policy and that Garrett is therefore entitled to the full claim file, including the surveillance videos and investigatory materials.  (Pl. 56.1 ¶ 149; Def. 56.1 ¶¶ 136–37; Stipulation (Doc. No. 4).)  Provident Life agreed to conduct an additional administrative review "specifically for the purpose of allowing plaintiff to introduce argument and evidence regarding the surveillance videos and investigatory materials (the 'Remand')," which was to be provided "promptly after the entry of this stipulation."  (Def. 56.1 ¶¶ 137–38; Stipulation at 2.)[1]  The stipulation provided that the civil action be stayed pending the completion of the review upon Remand.  (Stipulation at 3.)  On March 15, 2011, Magistrate Judge James Orenstein "so ordered" the stipulation.  (Order of 3/15/2011.)  Two days later, this Court ordered that this action be administratively closed without prejudice to any party's right to reopen upon letter request within 30 days of the disposition of the related administrative remand.  (Order (Doc. No. 5).)

On July 28, 2016, over five years after the parties entered into the stipulation, Garrett's attorney wrote to Provident Life and advocated for Garrett's benefits to be reinstated.  (Exhibit A to Begos Declaration (Doc. No. 49).)  With her appeal, Garrett's attorney provided Provident Life with the full Social Security Disability record and noted the Social Security

---

[1] Page numbers for all documents refer to pagination assigned by the Court's Electronic Case Filing system.

Administration's favorable decision.  (*Id.*)  Garrett also provided Provident Life with reports from doctors who treated Garrett since Provident Life had terminated benefits.  (Pl. 56.1 ¶¶ 164–77.)

Dr. Krishna continued treating Garrett and reported that a September 23, 2008, MRI showed "posterocentral disc herniation as noted at L4-L5 and L5-S1 levels, which demonstrated ventral impingement on the thecal sac as well as impingement on the intervertebral foramina bilaterally at each of these locations."  (Pl. 56.1 ¶ 171.)  Dr. Krishna noted in 2009 that Garrett had chronic pain her low back, right leg, left ankle, and right hip, and had difficulty sitting and standing.  (Pl. 56.1 ¶ 172.)  Dr. Krishna reported that Garrett was taking Lyrica, Elavil, Flector patch, Relafen, and Ambien.  (Pl. 56.1 ¶ 172.)  A November 3, 2015, report from Dr. Krishna states that Garrett "had multiple epidural injections to cervical/lumbar spine with no sustained relief."  (Pl. 56.1 ¶ 176; Exhibit C to Heck Aff. (Doc. No. 47-5) at 16.)

Provident Life responded to Garrett's appeal letter that it was under "no obligation to conduct an additional administrative review" because Garrett failed to "promptly" provide Provident with its arguments and evidence that Garrett wanted Provided Life to consider as agreed to in the 2011 Stipulation.  (Exhibit B to Begos Declaration (Doc. No. 49).)  Following this exchange, Garrett sought to reopen the civil case, which Magistrate Judge Orenstein did on August 26, 2016.  On January 18, 2019, both parties moved for summary judgment.  (Garrett Notice of Motion (Doc. No. 47-1); Provident Life Notice of Motion (Doc. No. 48).)

### III.    The Instant Motions

Garrett's motion for summary judgment argues that Provident Life wrongfully refused to review Garrett's 2016 appeal.  (Pl.'s MSJ at 10–14.)  Garrett contends that the Court should review the administrative record and the additional evidence *de novo*.  (*Id.* at 14–21.)  On the

merits, Garrett argues that the evidence supports her entitlement to long-term disability benefits under the Policy. (*Id.* at 21–28.) Garrett contends that Drs. Opam and Krishna's reports support a finding that she is disabled and that their reports were based on various medical tests including MRIs, EMGs, and SSEPs. (*Id.*) Garrett argues that Dr. Anant's report does not disprove Garrett's disability in part because Dr. Anant is a paid consultant and because Provident Life did not provide Dr. Anant with results from all of the tests that doctors performed on Garrett. (*Id.* at 22–23.) Garrett also addresses Provident Life's surveillance footage, arguing that the footage does not support Provident Life's position that she is not disabled because nothing in the videos depicts that she is able to do what her job requires – sit at a computer for 80–90% of the day. (*Id.* at 27.) Finally, Garrett argues that the examinations, reports, and treatment that continued after Provident Life terminated disability benefits are consistent with her doctor's prior findings and bolster her claim of disability. (*Id.* at 24–27.)

In opposition to Garrett's motion for summary judgment, Provident Life agrees that the Court should conduct a *de novo* review of the record and does not object to the Court considering the Garrett's supplemental documents. (Def.'s Opp. to Pl.'s MSJ (Doc. No. 47-7).) On the merits of Garrett's arguments, Provident Life argues that it correctly terminated Garrett's benefits based not only on the IMEs performed by Drs. Katz and Anant and the surveillance footage but also on voluminous additional sources of evidence including reviews by nurses, interviews with Garrett, and medical reviews by Drs. Saks, Cowell, Sternberg, and Yablon. (*Id.* at 15–18.)

Provident Life's arguments in opposition to plaintiff's motion for summary judgment are the same as their arguments in support of their own motion for summary judgment. Provident Life's cross-motion for summary judgment argues that the Court should confirm Provident Life's

determination terminating Garrett's benefits because Garrett has not proven by a preponderance of the evidence that she is unable to perform the substantial duties of her occupation.  (Def.'s MSJ at 22–27.)  Provident Life points to multiple reviews by doctors including, Drs. Anant, Saks, Sternberg, and Yablon, who all concluded that Garrett is capable of returning to work.  (*Id.* at 26.)  Provident Life also contends that the restrictions and limitations that Garrett's doctors found would not preclude Garrett from returning to work as an office manager.  (*Id.* at 27.)  Finally, Provident Life argues that Garrett is not credible because of the surveillance showing Garrett engaging in various activities without apparent pain or difficulty moving, conclusions by Dr. Anant that Garrett "could be 'malingering,'" and Garrett's 2015 guilty plea to petit larceny related to an insurance fraud.  (*Id.* at 27.)

In opposition to Provident Life's cross-motion for summary judgment, Garrett argues that Garrett's guilty plea is irrelevant to Garrett's complaint of pain and should not be considered because it is inadmissible.  (Pl.'s Opp. to Def.'s MSJ (Doc. No. 53).)  Citing *Naploi v. First Unum Life. Ins. Co.*, 78 Fed. App'x 787 (2d Cir. 2003) (summary order), Garrett also argues that summary judgment is inappropriate because the Court would have to adopt one expert's opinion over another's and the only way summary judgment would be appropriate would be to discount the opinions of one party's experts as unreliable as a matter of law.  (*Id.* at 17.)  Garrett argues that the Court cannot grant Provident Life's motion because the medical opinions that Garrett offered are not unreliable as a matter of law.  (*Id.* at 18.)  Garrett also argues that Provident Life is not entitled to summary judgment because it failed to perform a vocational analysis and instead relied on the opinions of Drs. Katz and Anant to opine on what duties Garrett could perform.  (*Id.* at 24–25.)  Garrett contends that these doctors are not qualified to provide such

opinions and therefore their opinions as to whether Garrett disabled under the Policy are meritless.  (*Id.*)

## STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, a Court should grant summary judgment if there is "no genuine issue as to any material fact."  FED. R. CIV. P. 56(c)(2).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether disputed issues of material fact exist, the court must draw all reasonable inferences in favor of the non-moving party.  *See, e.g., Shapiro v. N.Y. Univ.*, 640 F. Supp. 2d 411, 417–18 (S.D.N.Y. 2009) (citing *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## DISCUSSION

Under ERISA, a beneficiary of a long-term disability plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  The Supreme Court in *Firestone Tire & Rubber Co. v. Bruch* explained that "a denial of benefits . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator . . . authority to determine eligibility for benefits or to construe the terms of the plan."  489 U.S. 101, 115 (1989).  The parties and the Court agree that the Court should review the Administrative Record *de novo* because the Policy does not contain a grant of authority to the administrator to determine eligibility.  "Under a de novo standard of review, no deference is given to the plan administrator's interpretation of the plan."  *Wilson v. Aetna Life Ins. Co.*, No. 15-CV-752 (MAD) (CFH), 2016 WL 5717370, at *5 (N.D.N.Y. Sept. 30, 2016) (citing *Katzenberg v. First Fortis Life Ins. Co.*, 500 F. Supp. 2d 177, 193–94 (E.D.N.Y. 2007)).

In order to establish entitlement to benefits, a plaintiff must "prov[e] by a preponderance of the evidence that [s]he is totally disabled within the meaning of the plan." *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006); *see also Critchlow v. First Unum Life Ins. Co. of Am.*, 378 F.3d 246, 256–57 (2d Cir. 2004) ("[A]s a matter of general insurance law, the insured has the burden of proving that a benefit is covered, while the insurer has the burden of proving that an exclusion applies, and these principles too are applicable in ERISA cases.") (internal quotation marks and citations omitted). "Although a district court's *de novo* review of an ERISA plan determination is generally limited to the administrative record, a district court may consider additional evidence for good cause." *Keiser v. CDC Inv. Mgmt. Corp.*, 160 F. Supp. 2d 512, 518 (S.D.N.Y. 2001) (citing *DeFelice v. Am. Int'l Life Assurance Co.*, 112 F.3d 61, 67 (2d Cir. 1997)).

Summary judgment is inappropriate and genuine issues of material fact exist in ERISA benefit disputes where the Court must adopt one expert's opinion over another's. *See Napoli*, 78 F. App'x at 789 (vacating district court's grant of summary judgment and remanding for trial where district court discredited doctor's opinion that beneficiary should not return to prior occupation); *see also McDonnell v. First Unum Life Ins. Co.*, No. 10-CV-8140 (RPP), 2013 WL 3975941, at *13 (S.D.N.Y. Aug. 5, 2013) (collecting cases). The proper stage for credibility determinations is at trial. *Id.* "Summary judgment may only be rendered in such cases where the opinions of one party's experts are unreliable as a matter of law." *McDonnell*, 2013 WL 3975941, at *13 (citing *Napoli*, 78 F. App'x at 789).

Here, the parties move for summary judgment as to whether Garrett remained disabled under the plan on May 11, 2007, and thereafter due to injuries from her November 22, 2000, car accident, such that Provident Life should have continued to pay long-term disability benefits.

24

The motions are mirror-images of each other and the arguments overlapping.  Accordingly, the Court will consider them together.

To prevail on her claim for benefits, Garrett must demonstrate by a preponderance of the evidence that she is totally disabled within the meaning of the Policy.  The Policy states that Total Disability means that "you are not able to perform the substantial and material duties of your occupation."  Garrett's occupation, an office manager, requires her to work at a computer for a majority of the day.  The Administrative Record is replete with medical evidence submitted by Garrett and Provident Life.  The medical opinions from Garrett's treating physicians and from the physicians from whom Provident Life sought review or examination of Garrett offer conflicting reports and opinions regarding the extent of Garrett's injuries from her accident, the veracity of claims of pain and disability, and most importantly, her ability to work as an office manager.

For example, Dr. Krishna, a neurologist and one of Garrett's treating physicians, diagnosed Garrett with chronic left C5-C6 cervical radiculopathy and chronic L5-S1 lumbosacral radiculopathy revealed on EMG testing performed in 2004.  According to Dr. Krishna, an MRI of Garrett's lumbar spine showed a posterior disc bulge at L4-L5, mild narrowing of the spinal canal at L5-S1, and a slightly right-sided disc herniations at L5-S1.  After Provident Life's termination of benefits, Dr. Krishna continued to treat Garrett and administered epidural injections and medications to manage pain including, Ambien, Neurontin, Lidoderm Patch, Xanax, and Elavil.  The Court is mindful that it need not automatically accord special weight to Dr. Krishna's opinion as Garrett's treating physician.  *See Tretola v. First Unum Life Ins. Co.*, No. 13-CV-231 (PAE), 2015 WL 509288, at *29 n.21 (S.D.N.Y. Feb. 6, 2015) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) ("As the United States Supreme Court

has noted, 'if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.'")).

On the other hand, Dr. Anant, a neurosurgeon who is one of the multiple doctors who examined Garrett at Provident Life's request, found Garrett's neurological examination normal and that she had no motor defects.  Dr. Anant's IME report states that Garrett's "cervical spine movements are normal . . . ."  Dr. Anant found the results of various testing suspect and he reviewed the surveillance tapes and reported that Garrett was "not limited in any specific way." Dr. Anant found that the tapes corroborated his examination of her.  He reviewed an MRI from 2000 of the lumbar spine, which he found "essentially normal except for mild degeneration of the L5-S1 disc space," and a cervical MRI, which he concluded was "normal."  Dr. Anant concluded that Garrett was not disabled and could perform the tasks of an office manager.

In an attempt to discredit Dr. Anant's findings, Garrett claims that Provident Life did not provide Dr. Anant with Garrett's 2004 and 2005 MRIs performed by Dr. Krishna and therefore he was not provided with the full set of data from which to base his opinion.  (Pl.'s MSJ at 6.) This is false.  Provident Life repeatedly requested all MRIs and other imaging from both Garrett and Dr. Krishna and Garrett did not provide it.  (AR1512, AR1547.)  Garrett attempts to further discredit Dr. Anant because he was compensated for his review and examination of Garrett by Provident Life.  (Pl.'s MSJ at 22.)  The Court cannot assess the credibility of experts at this stage.  That argument can be raised at trial.

After Provident Life sent Dr. Anant's IME report to Dr. Krishna, Dr. Saks called Dr. Krishna to discuss the conflicting findings in Dr. Anant's report and Dr. Krishna's assessments. Dr. Saks memorialized their conversation and sent a copy of the letter to Dr. Krishna.  The letter details Dr. Krishna's assessment of Garrett.  Dr. Saks asked Dr. Krishna to sign the letter if he

agreed that the contents accurately represented their call.  Tellingly, Dr. Krishna added one

sentence to the letter, "[S]he is not fit for gainfull [sic] employment."

These selected opinions, none of which is unreliable as a matter of law, present genuine

issues of material fact that cannot be resolved at this stage.  *See Bennett-Brady v. Aetna Life Ins.

Co.*, No. 14-CV-635S, 2019 WL 483317, at *7 (W.D.N.Y. Feb. 7, 2019).  Resolving these issues

would require a credibility determination that cannot be made by the Court on a motion for

summary judgment but can be made when the Court acts as a fact-finder in a bench trial.[2]

*See Napoli*, 78 Fed. App'x. at 789; *see also Baumer v. Ingram Long Term Disability Plan*, 803 F.

Supp. 2d 263, 268 (W.D.N.Y. 2011).  Accordingly, upon viewing the administrative record, the

supplemental record, and the parties' briefs under the *de novo* standard, this Court finds that

neither party is entitled to summary judgment at this time.

## CONCLUSION

For the reasons set forth above, the parties' cross-motions for summary judgment are

denied.   This action is recommitted to the assigned Magistrate Judge for all remaining pre-trial

matters, including settlement discussions if appropriate.

SO ORDERED.

Dated: Brooklyn, New York
     May 22, 2020

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
Chief United States District Judge

---

[2] Since the Court cannot consider Garrett's credibility upon this motion for summary judgment, the admissibility of Garrett's guilty plea to petit larceny in connection with an unrelated insurance fraud, which Provident Life argues bears directly on Garrett's credibility, need not be addressed.  This issue should be raised in a motion *in limine* prior to trial.