# EXHIBIT A

# IN THE MATTER OF UNUM LIFE INSURANCE COMPANY OF AMERICA
## Portland, Maine

**REGULATORY SETTLEMENT AGREEMENT**

**TARGETED MULTISTATE DISABILITY
INCOME MARKET CONDUCT EXAMINATION**

This Regulatory Settlement Agreement ("Agreement") is entered into as of this ____ day of November, 2004, by and between Unum Life Insurance Company of America (the "Company"), the Superintendent of the State of Maine Bureau of Insurance (the "Lead Regulator"), the Commissioner of the Tennessee Department of Commerce and Insurance, and the Commissioner of the Massachusetts Division of Insurance (collectively with the Lead Regulator, the "Lead Regulators"), the insurance regulators of each of the remaining States, the District of Columbia and American Samoa that adopt, agree to and approve this Agreement (the "Participating Regulators") and the United States Department of Labor (the "DOL").

## A. Recitals

1. The Company maintains its home office at Portland, Maine. At all relevant times, the Company has been a licensed insurance company domiciled in the State of Maine. The Company and its affiliates Provident Life and Accident Insurance Company and Provident Life and Casualty Insurance Company (collectively "Provident") and The Paul Revere Life Insurance Company ("Revere") are subsidiaries of UnumProvident Corporation, a Delaware corporation, with its principal place of business in Chattanooga, Tennessee (the "Parent Company"). At all relevant times, Provident is and has been a licensed insurance company domiciled in the State of Tennessee, and Revere is and has been a licensed insurance company domiciled in the Commonwealth of Massachusetts. The Company, Provident, and Revere, are collectively referred to as the "Companies."

2. On September 2, 2003, the Lead Regulators of the domiciliary states of the Companies, Maine, Massachusetts, and Tennessee called a multistate targeted market conduct examination of the Company, Provident Life and Accident Insurance Company and Revere (the "Multistate Examination") to determine if the individual and group long term disability income claim handling practices of the Companies reflected systemic "unfair claim settlement practices" as defined in the National Association of Insurance Commissioners ("NAIC")*Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance Model Act (1972)* or *NAIC Claims Settlement Practices Model Act* (1990) (collectively, the "Model Act") pursuant

to the procedures established by the *NAIC Market Conduct Examiner's Handbook* (the "Handbook").

3. The other forty-seven states, the District of Columbia and American Samoa chose to be "Participating States" in the Multistate Examination. Contemporaneously with the Multistate Examination, the DOL was conducting an investigation of the Companies (the "DOL Investigation") pursuant to Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1134.

4. As a result of the Multistate Examination, the Lead Regulators engaged in discussions with the Companies with respect to regulatory concerns raised by the Multistate Examination, a plan of corrective action by the Companies to address those concerns for the benefit of the Companies' current and former policyholders and insureds, and a means of providing for the enforcement of such a plan. After extensive discussion, the Companies agreed to a plan of corrective action to be set forth in this Agreement and substantially identical regulatory settlement agreements between each of Provident and Revere and their respective domiciliary regulators and to the payment of a $15,000,000 fine. In addition, the insurance subsidiary of the Parent Company domiciled in New York, First Unum Life Insurance Company (the "New York subsidiary"), will enter into a substantially identical regulatory settlement agreement with the New York Superintendent of Insurance and the Lead Regulators. As the result of the ongoing Multistate Examination and the DOL Investigation, the Companies, the DOL and the Lead Regulators decided to enter into a global settlement resolving common matters pertaining to the Multistate Examination and the DOL Investigation. An Examination Report concerning the Multistate Examination is being released concurrently with this Agreement that contemplates the execution of this Agreement and/or the entry of consent orders where necessary under the law or practice of a particular Participating Regulator's state.

5. The plan of corrective action addresses a number of regulatory and statutory concerns raised by the Lead Regulators and the DOL. It seeks to accomplish the following:

a. provide an effective Claim Reassessment Process for an identified class of claimants who seek review of the earlier decision using an experienced claim unit formed by the Companies solely for this purpose to (i) perform a de novo review of the claims using past and current information that is relevant to the claim decision and (ii) apply the improved claim handling procedures contemplated by this Agreement in order that this Claim Reassessment Process constitute a fair way in which to remedy deficiencies that may have affected the earlier claim decisions covered by this Agreement;

b. provide changes to claim procedures that will improve the claim handling process and benefit current and future policyholders and insureds by

(i) reflecting regulatory standards in the area of market conduct for handling disability claims, (ii) addressing the Companies' commitment to claim handling procedures that promote the fair, objective and thorough treatment of claims and be indicative of best practices in the handling of individual and group long term disability claims, and (iii) complying with applicable state and federal laws and regulations; and

      c. provide for oversight in order to ensure compliance or effect enforcement, which oversight and ongoing monitoring includes (i) additions to the governance structure of the Parent Company and (ii) review by the Lead Regulators and the DOL so that activities of the Companies hereunder and reviews by staff or examiners of the Lead Regulators and the DOL will result in quarterly reporting on the results of the Claim Reassessment Process and generally on the handling of individual and group long term disability claims and appropriate follow-up to resolve questions or correct any potential non-compliance with policies or procedures.

      6. This Agreement sets forth (i) the plan of corrective action, (ii) provisions concerning the enforcement of the Company's compliance with the plan of corrective action, and (iii) other miscellaneous provisions of this Agreement.

      7. Location of Definitions. Listed definitions are contained in this Agreement unless there is specific reference to the definition being in an Exhibit or Attachment to an Exhibit to this Agreement.

      a. "Agreement" is defined in the preamble paragraph.

      b. "AP" is defined in paragraph B.3.c.(i)

      c. "Applicable Consent Order" is defined in paragraph C.5.c.

      d. "Board of Directors" is defined in paragraph B.1.a.

      e. "Claim Reassessment Process" is set forth in paragraph B.2.

      f. "Claim Reassessment Unit" is defined in paragraph B.2.a.

      g. "Company" is defined in the preamble paragraph.

      h. "Companies" is defined in paragraph A.1.

      i. "DOL" is defined in the preamble paragraph.

      j. "DOL Investigation" is defined in paragraph A.3.

      k. "ERISA" is defined in paragraph A.3.

      l. "FCE" is defined in paragraph B.3.c.(i)

m. "Governance Implementation Date" is defined in paragraph B.1.a.

n. "Group" is defined in paragraph B.3.j.

o. "Handbook" is defined in paragraph A.2.

p. "IME" is defined in paragraph B.3.c.(i)

q. "Implementation Date" is defined in paragraph B.2.a.

r. "Lead Regulator(s)" is defined in the preamble paragraph.

s. "Model Act" is defined in paragraph A.2.

t. "Multistate Examination" is defined in paragraph A.2.

u. "New York subsidiary" is defined in paragraph A.4.

v. "NAIC" is defined in paragraph A.2.

w. "Parent Company" is defined in paragraph A.1.

x. "Participating Regulators" is defined in the preamble paragraph.

y. "Plan" is defined in the heading to paragraph B.

z. "Regulatory Compliance Committee" is defined in paragraph B.1.c.

aa. "Requesting Claimant" is defined in paragraph B.2.b.

bb. "Specified Claimant" is defined in paragraph B.2.b.

## B. Plan of Corrective Action (the "Plan")

1. Changes in Corporate Governance

a. Expansion of Board of Directors. The Lead Regulators, and the Board of Directors of the Parent Company (the "Board of Directors") have agreed that additional members with specific experience and qualifications shall be added to the Board of Directors. (Prior to entering this Agreement the Board of Directors directed a search using an outside search firm to identify candidates with senior management experience in the insurance or financial services industries and on August 12, 2004 elected three new independent directors with such qualifications.) The Board of Directors shall be expanded by the addition of three other directors who shall be "independent" directors under current rules of the New York Stock Exchange. In the first instance, two directors will be added, each of whom will have significant insurance industry or insurance regulatory experience, and they will be approved by the Lead Regulators. The Company shall provide the names of the two prospective new members of the Board of Directors to the Lead Regulators by November 19, 2004. If the two proposed

new members are approved by the Lead Regulators prior to December 15, 2004, they will be elected by the Board of Directors no later than December 16, 2004. However, if either or both of the two proposed new members is disapproved, the Board of Directors will continue in good faith to search to identify to the Lead Regulators as promptly as reasonably practicable (but no later than 60 days from the date of such disapproval) one or two additional qualified candidates, as appropriate, to propose as members of the Board of Directors. Following their approval by the Lead Regulators, such person or persons shall be elected by the Board of Directors at its next regularly scheduled meeting. The date of the election of the second of the two new members to the Board of Directors will be the "Governance Implementation Date", unless the two new members approved by the Lead Regulators are elected to the Board of Directors prior to November 19, 2004, in which case the Governance Implementation Date will be December 16, 2004. In addition to the two directors described above, the Board of Directors undertakes that the next following person to be added to the Board of Directors as a result of the retirement, resignation, death or failure to stand for reelection of an existing director or to fill an existing or newly-created vacancy will be a person with significant insurance regulatory experience. In any event, a person with such qualifications will be proposed by the Board of Directors for board membership and such person's name shall be provided to the Lead Regulators no later than June 30, 2005. If the Lead Regulators approve the proposed new member, the person will be elected to the Board of Directors at the next regular meeting of the Board of Directors following approval. If the Lead Regulators disapprove the proposed new member, the Board of Directors will continue in good faith to search to identify as promptly as reasonably practicable (but no later than 60 days from the date of such disapproval) a person with such qualifications to propose as a member of the Board of Directors. Following the candidate's approval by the Lead Regulators, the person will be elected to the Board of Directors at its next regularly scheduled meeting. If any of the new directors ceases to serve as a director prior to the end of the term of this Agreement, the process described in this paragraph shall be applied to the selection of any replacement.

b. Audit Committee. No later than the Governance Implementation Date, at least one of the new directors referenced in paragraph B.1.a. will be appointed to the Audit Committee.

c. Creation of Regulatory Compliance Committee. No later than the Governance Implementation Date, the Board of Directors shall establish a new standing committee that shall consist of the two new directors and three existing independent directors, the "Regulatory Compliance Committee". The responsibilities of the Regulatory Compliance Committee shall include monitoring and reporting to the Board of Directors regarding the Parent Company and its subsidiaries' compliance with applicable laws concerning market conduct, Title 1 of ERISA, and the Companies' compliance with the Plan,

along with such other matters as may be authorized or delegated by the Board of Directors to assist the Board in the discharge of its fiduciary duties and responsibilities.

d. Creation of Regulatory Compliance Unit. No later than the Implementation Date, the Parent Company shall form a new Regulatory Compliance Unit of officers or employees of the Parent Company or its subsidiaries who shall not be members of the Claim Reassessment Unit discussed below. The Regulatory Compliance Unit shall report directly to the Regulatory Compliance Committee (or to the Board of Directors until such Committee is appointed) with respect to all market-conduct matters and ERISA requirements. The responsibilities of the Regulatory Compliance Unit shall include (i) monitoring compliance with applicable laws concerning market conduct and ERISA requirements, (ii) monitoring compliance with the Plan (including the functions of the Claim Reassessment Unit) through the performance of periodic audits, (iii) providing assistance to claimants upon request that will ease and facilitate the claim submission process, and (iv) gathering data to facilitate the Lead Regulators' and the DOL's ongoing monitoring of the Companies' compliance with the Plan. The Regulatory Compliance Unit shall be managed by an officer who is an experienced insurance professional, whose experience includes compliance related matters. Employees of the Parent Company and all of its subsidiaries shall be provided with a toll free hotline number to confidentially report concerns respecting claim handling, such reports to be provided to the manager of the Regulatory Compliance Unit. Claimants shall be provided with a toll free hotline number for assistance throughout the claim handling process, the performance of which will be monitored by the Regulatory Compliance Unit. A log of all telephone calls to both hotline numbers shall be maintained, and quarterly reports concerning such logs shall be provided to the Regulatory Compliance Committee.

e. Quarterly Board Committee and Management Meetings with Lead Regulators and the DOL. During each calendar quarter beginning with the regular quarterly meeting of the Board of Directors following the Governance Implementation Date, the Regulatory Compliance Committee and the management of the Company shall each meet separately with the Lead Regulators to evaluate compliance with the Plan. The DOL shall receive notice of these quarterly meetings and may attend as it deems appropriate. The Lead Regulators shall update Participating Regulators concerning these meetings through the NAIC on a quarterly basis.

2. Claim Reassessment Process

a. Formation of Claim Reassessment Unit. Thirty (30) days after approval of this Agreement by the Company , the Lead Regulators, the DOL and no less than two-thirds of the Participating States in the Multistate Examination, unless a lesser number is agreed to by the Companies (and assuming approval of substantially identical regulatory settlement agreements between each of

Provident and Revere and their respective domiciliary regulators, and the execution of a substantially identical regulatory settlement agreement between the New York subsidiary, the New York Superintendent of Insurance and the Lead Regulators) (the "Implementation Date"), the Company shall form a claim reassessment unit staffed with experienced claim representatives to handle further review of previously denied or terminated individual and group long term disability claims that are resubmitted under this paragraph (the "Claim Reassessment Unit"). The Claim Reassessment Unit shall be managed by an experienced claim manager and shall report to the most senior executive in charge of claim operations. The Claim Reassessment Process, unit structure and operating procedures of the Claim Reassessment Unit, developed in consultation with and approved by the Lead Regulators and the DOL, are described in Exhibit 1 attached hereto. Staffing of the Claim Reassessment Unit shall be adjusted appropriately from time to time so that claim decisions are made in a timely manner in accordance with the operating procedures set forth in Exhibit 1.

   b. Implementation of Claim Reassessment Process. Beginning earlier and ending no later than the fifteenth business day following the Implementation Date, the Companies shall mail a notice (in the form of Attachment A-1 to Exhibit 1) to all of the Specified Claimants advising that they may resubmit their claim for further review by the Claim Reassessment Unit established for that purpose. "Specified Claimant" means any claimant of one of the Companies or any claimant of the New York subsidiary, who presented a claim for group or individual long term disability benefits, and whose claim was denied or whose benefits were terminated on or after January 1, 2000 and prior to the Implementation Date for reasons other than the following: (i) death of the claimant, (ii) claim was withdrawn, (iii) claimant did not satisfy the elimination period, or (iv) maximum benefits were paid, and also excludes (x) a claimant who had his or her claim resolved through litigation or settlement, or (y) a claimant who has pending litigation against the Company challenging the denial or termination of his or her claim, which lawsuit was filed after the date of receipt of notice of the Claim Reassessment Process or a claimant whose lawsuit was filed prior to the date of receipt of notice of the Claim Reassessment Process in which lawsuit there has been a verdict or judgement on the merits prior to completion of the reassessment on the claim. Specified Claimants whose claims were denied or benefits terminated due to a return to work shall receive a special notice in the form of Exhibit 1, Attachment A-2 . The Claim Reassessment Process will be available to:

   1. Any of the Specified Claimants who elect to participate within the time period set forth in Exhibit 1; and

   2. Any other group or individual long term disability claimant of one of the Companies (or of the New York subsidiary) whose claim was denied or whose benefits were terminated prior to January 1, 2000 and who requests participation in the Claim Reassessment Process, provided that any such denial or termination of benefits took place no earlier than January 1, 1997 and the

claimant would otherwise be included with the definition of "Specified Claimant" except for the application of the January 1, 2000 date; and

3. Any other group or individual long term disability claimant of one of the Companies (or of the New York subsidiary) whose claim was denied or whose benefits were terminated on or after January 1, 1997 and prior to the Implementation Date, who disputes the Companies' characterization on any rational basis that such denial or termination falls into any of the reasons outlined in (i) – (iv) of the definition of "Specified Claimant" and who requests to participate in the Claim Reassessment Process.

Any claimant who requests to participate pursuant to subparagraphs 2. or 3. above shall be referred to herein as a "Requesting Claimant". The initial notice will inform each Specified Claimant (i) how to communicate to the Company his or her election to participate and the time period in which to respond, (ii) that he or she will be sent an acknowledgement of their election to participate, (iii) that the Claim Reassessment Process will review claims based on the original dates of their closure or denial with the oldest claims being reviewed first, (iv) that after electing to participate, a subsequent notice (Attachment B to Exhibit 1) will be sent at a time that is closer to the period when his or her claim will be reviewed indicating the approximate time period of that review and seeking information on a Reassessment Information Form (Attachment C to Exhibit 1) to support the Claim Reassessment, (v) that receipt of a completed Reassessment Information Form will be acknowledged, and (vi) that by electing to have his or her claim reassessed, the claimant conditionally agrees to forego the pursuit of a legal action as specified in paragraph B.2.d. The phased approach to review and follow up notices are intended to provide Specified Claimants and Requesting Claimants who elect to have their claim reviewed a better indication of the timing of that review and when to expect a decision. In conducting all reviews, including but not limited to reviews conducted pursuant to the Claim Reassessment Process, the Companies must give significant weight to evidence of an award of Social Security disability benefits as supporting a finding of disability, unless the Companies have compelling evidence that the decision of the Social Security Administration was (i) founded on an error of law or an abuse of discretion, (ii) inconsistent with the applicable medical evidence, or (iii) inconsistent with the definition of disability contained in the applicable insurance policy. The Company shall maintain its records so that the filing and results of the Claim Reassessment Process may be tracked on a state-by-state basis as well as on a group basis.

4. The Company commits to use its best efforts to complete the Claim Reassessment Process by December 31, 2006, although, for good cause shown, the Lead Regulators and the DOL may agree to extend the time for completing that process.

c. Monitoring of Claim Reassessment Process. The Regulatory Compliance Unit shall conduct or cause to be conducted ongoing audits of the

Claim Reassessment Process and report its findings to the Regulatory Compliance Committee, the Lead Regulators, the DOL and senior management at least quarterly. The Lead Regulators shall monitor the Claim Reassessment Process and shall conduct examinations of the Claim Reassessment Unit decisions in the manner and at such intervals as they deem appropriate. The DOL may monitor the Claim Reassessment Process and conduct examinations of the Claim Reassessment Unit as it deems appropriate. The results of the internal audits directed by the Regulatory Compliance Unit and the reviews of claim reassessment decisions directed by the Lead Regulators will be reviewed at the quarterly meetings contemplated by paragraph B.1.e. above in order to specifically evaluate the ongoing performance of the Claim Reassessment Process. Any cases reported by the Regulatory Compliance Unit or by the Lead Regulators at the quarterly meetings that have not resolved an identified potential error or claim handling practice that is non-compliant will be promptly addressed by further review of the Claim Reassessment Unit and reported on at the next quarterly meeting. The Lead Regulators shall meet quarterly with the Regulatory Compliance Committee and senior management of the Companies to review the status of the Claim Reassessment Process. The DOL shall receive notice of these meetings and may attend as it deems appropriate.

      d. Effect on Litigation. This Agreement neither imposes any obligations upon, nor takes away any rights of, any claimant who chooses not to resubmit for reassessment his or her previously denied or terminated claim for benefits. Rather, the purpose of the Claim Reassessment Process provided for under this Agreement is to offer an entirely optional method for claimants who wish to have their claims reassessed under these procedures. If a claimant does decide to resubmit his or her claim for reassessment, however, then the Company may require such claimant to agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, then such claimant shall not pursue any legal action to the extent (and only to the extent) such action is based on any aspect of the prior denial or termination that is reversed or changed. If the Company does so require, then any applicable statutes of limitations shall be tolled during the pendency of the Claim Reassessment Process. A copy of this Agreement shall be the only evidence required of such tolling. If a claimant has pending litigation against the Company, is eligible under this Agreement to participate in the Claim Reassessment Process and decides to resubmit his or her claim for reassessment, then the Company may require the claimant to (i) take such action as is necessary to stay such litigation pending the Claim Reassessment Process, if the court will agree to such a stay, and (ii) agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, then such claimant shall withdraw any litigated claim, including any extra-contractual claims, to the extent (and only to the extent) such claims are based on any aspect of the prior denial or termination that is reversed or changed. That is, to the extent that following the reassessment there remains a complete or partial denial of benefits, a

claimant's right to initiate or continue litigation regarding that portion of the prior denial that has not been reversed or changed shall not be waived. As to any such claimant in whose litigation a final verdict or judgement is entered prior to completion of the claimant's reassessment, the Company's obligation to conduct and/or complete the Claim Reassessment Process pursuant to this Agreement shall cease.

3. Changes in Claim Organization and Procedures

a. Changes in Claim Organization. The Company's claim organization shall include the following ongoing objectives:

(i) Engagement of experienced claim personnel at the earliest stage of reviewing a claim;

(ii) Increased emphasis upon claim staff accountability for compliance with the terms of insurance          policies and applicable law;

(iii) Increased involvement of higher levels of management in claim denial and benefit termination          decisions through approval requirements;

(iv) Creation of a separate compliance-accountability function at the claim denial and benefit          termination level focusing on compliance, documentation, accountability for compliance, whether          the claimant has been treated fairly under the circumstances, and any action that may be construed          as an instance of an improper claim practice.

No later than the Implementation Date, the Company shall implement changes to its claim organization consistent with the foregoing objectives and developed in consultation with the Lead Regulators and the DOL as described in Exhibits 2 and 3 hereof.

b. Communications with Appeals Personnel. Company personnel (including but not limited to claims handling personnel) shall not interfere with nor attempt in any way to influence other Company personnel involved with the separate appeal process following denial of benefits or termination of any claim.

c. Changes in Claim Procedures. The Company's claim procedures shall include the following ongoing objectives:

(i) Increased focus on policies and procedures relating to medical and related evidence, including          but not limited to the following:

- Obtaining complete medical records needed for the decision;
- Appropriate use and consideration of in-house medical resources;
- Contacting an Attending Physician ("AP") where circumstances warrant and fairly interpreting or applying information from the claimant's AP;

- Obtaining a field visit where circumstances warrant;
- Conducting an occupational review, as appropriate;
- Obtaining an Independent Medical Evaluation ("IME") or Functional Capacity Evaluation ("FCE") in appropriate circumstances and fairly interpreting or applying the IME or FCE , without any attempt to influence the impairment determinations of professionals conducting the IME and/or FCE;

(ii) Clear and express notice to claimants of the information to be provided by the claimants and         the information to be collected by the Company. If a file is determined to lack specific information,         Company personnel will work with claimant to obtain such information in accordance with              appropriate procedures established for such purposes.

No later than the Implementation Date, the Company shall implement changed claim procedures consistent with the foregoing objectives developed in consultation with the Lead Regulators and the DOL as described in Exhibits 4, 5, 6, and 7 hereto.

d. Selection of Evaluation Personnel. The Company shall select individuals to conduct IMEs or FCEs solely on the basis of objective, professional criteria, and without regard to results of previous IMEs or FCEs conducted by such individuals.

e. Professional Certification. Each clinical, vocational and medical professional employed by the Company must execute the "Statement Regarding Professional Conduct" found at Exhibit 5, which includes a commitment to provide fair and reasonable evaluations considering all available medical, clinical, and/or vocational evidence, both objective and subjective, bearing on impairment. In addition, for each determination as to a claimant's impairment(s), each clinical, vocational and medical professional who makes a determination as to claimant impairments must certify that he or she has reviewed all medical, clinical and vocational evidence provided to that professional by Company personnel bearing on the impairment for which such professional is trained prior to making a determination as to such impairments.

f. Providing Medical, Clinical and/or Vocational Evidence. Claim personnel, in soliciting evaluations of claimant impairment by clinical, vocational and medical professionals (employed by the Company or otherwise), shall provide to such professionals all available medical, clinical and/or vocational evidence in the claim file, both objective and subjective, concerning impairment.

g. Claims involving co-morbid conditions. (i) When multiple conditions or co-morbid conditions are present, Company personnel will ensure that all diagnoses and impairments are considered and afforded appropriate weight in developing a coherent view of the claimant's medical condition, capacity and restrictions/limitations. (ii) No later than the Implementation Date, the Companies will implement improved procedures for evaluating claims which

involve multiple or co-morbid conditions in accordance with Exhibit 4 hereto and subparagraph (i) above.

h. Training. No later than March 1, 2005, substantially all employees in the Company's claim operations shall be provided appropriate training designed to educate them on the responsibilities arising from the changes in claim procedures included in paragraph B.3 of this Agreement with emphasis on concerns raised in the Multistate Examination and the corrective measures set forth in the Plan. This training will include specific instruction on the following: (i) Company personnel should recognize the special function that medical professionals perform in assessing medical information concerning claimants and should not attempt to influence an in-house physician or an IME or FCE in connection with such professional's opinion concerning the medical evidence or medical condition relating to a claimant, and (ii) Company personnel in claim handling positions will be evaluated and will be eligible for incentive compensation only on the basis of the quality of performance in the position each holds, and the outcome of any claim decision or any number of claim decisions is not permitted as a part of this evaluation or award of incentive compensation. The Company hereby confirms that it shall not measure the performance of claim personnel or otherwise incentivize their performance, or deny or close specific claims based on claim denial or closure targets. Not later than March 1, 2005, all group policyholder human resources staff shall be offered appropriate training alternatives designed to help them support employee-claimants in making claims.

i. Monitoring of Compliance with Revised Claim Procedures. The Lead Regulators shall monitor compliance with the changes in claim procedures set forth in paragraphs B.3.b. through B.3.g. above and may conduct examinations of claims in the manner and at such intervals as the Lead Regulators deem appropriate. The DOL may monitor compliance with changes in claim procedures set forth in paragraphs B.3.b. through B.3.g above and may conduct examinations of claims in the manner and at such intervals as the DOL deems appropriate. The examinations of claims will include but not be limited to review of claim files for the following problems, including failure to:

- Conduct a field visit where circumstances warrant;
- Obtain complete medical records;
- Fairly interpret or apply information from the claimant's AP;
- Use appropriate in-house medical resources;
- Fairly interpret or apply in-house medical opinions;
- Contact AP where circumstances warrant;
- Conduct appropriate occupational review;
- Obtain an IME or FCE where circumstances warrant;
- Select individuals to conduct IMEs and FCEs solely on the basis of objective, professional criteria, and without regard to results of previous IMEs or FCEs;

- Fairly interpret or apply IME or FCE results;
- Appropriately classify disabilities under the mental and nervous limitation provisions of its policies; or
- Follow Company claim procedures or other Company procedures.

Claim files will also be examined for evidence of:

- Reliance on lack of "objective" data or "objective" medical information as a basis for claim denial or termination of benefits;
- Faulty or overly restrictive interpretation or application of policy provisions, including the definition of "occupation" in "own occupation" policies;
- Actions suggesting a pre-disposition or bias against the claimant;
- Threats to seek repayment of past benefits;
- Forcing claimants to seek legal counsel to obtain benefits; or
- Evidence of any incentives provided to deny or terminate benefits.

j. Standard for Compliance. The Company shall be deemed in compliance with the Handbook's maximum tolerance standard for claim procedures (presently 7%) unless the collective number of claim files with errors for the Company and its affiliated companies executing substantially similar agreements as of this date (the "Group") results in an error rate that exceeds such maximum tolerance standard. Such error rate(s) shall be determined by the Lead Regulators' review of separate statistically credible random samples of the total files for the Group's long term *group* and *individual* disability income insurance claims denied or benefits terminated on or after the Implementation Date, in accordance with paragraph B.3.i above. Separate Group error rates shall be determined for the Group's long term: (i) group disability income claims; and, (ii) individual disability income claims.

k. Opportunity for Review and Comment. The Companies shall be entitled to review and comment on any such examination results in accordance with the provisions of the Handbook.

l. Claim Files. A claim file shall include all documents relating to a claim history and/or decision, including but not limited to correspondence, medical records, vocational records, forms, internal memoranda and internal communications (including e-mail communications), which shall be maintained in the claim file either in a paper file, or in electronic form in the case of the Companies' offices which operate in a "paperless" environment. The Lead Regulators and the DOL shall have access to all such paper or electronic files at all times. All claims reassessments pursuant to Paragraph B.2. and all new claim reviews pursuant to Paragraph B.3. shall be based upon a review of the entire claim file.

## C. Other Provisions

1. This Agreement shall be governed by and interpreted according to laws of the State of Maine, excluding its conflict of laws provisions, and any applicable federal laws.

2. It is expected that the Lead Regulators, on behalf of and for the benefit of the Participating Regulators, will monitor the Company's compliance with this Agreement and any Consent Order to which it is attached. The DOL may also monitor the Company's compliance with this Agreement and any consent Order to which it is attached. It is further expected that the Lead Regulators, on behalf of and for the benefit of the Participating Regulators, will conduct a full re-examination of the issues addressed by the Multistate Examination within twenty-four months after the Implementation Date and make all reasonable efforts to complete such re-examination within six months of its commencement. The DOL also reserves the right to conduct further investigation as it deems appropriate.

3. The reasonable costs of the Lead Regulators in monitoring the Company's compliance with this Agreement, including the cost of conducting any reviews or examinations provided for by the Agreement, shall be paid by the Company.

4. This Agreement is being made in conjunction with the entry of related Consent Orders arising from the Multistate Examination, and it shall be implemented and administered harmoniously with those Consent Orders.

5. a. The Lead Regulator shall deliver this Agreement to each of the Participating States within five (5) days following its execution by the Company, the DOL and the Lead Regulator.

b. Each person signing on behalf of a Participating State gives his/her express assurance that under applicable state laws, regulations and judicial rulings, that the person has the authority to enter into this Agreement on behalf of the Participating State.

c. Each Participating Regulator shall execute and deliver this Agreement to the Lead Regulator within thirty (30) days following the receipt of this Agreement from the Lead Regulator. If a Participating Regulator finds that, under applicable state law, regulation or procedure, the preparation and execution of a consent order is necessary to carry out the terms of this Agreement, such a consent order (the "Applicable Consent Order") shall be prepared by such Participating Regulator within thirty (30) days following the receipt of this Agreement from the Lead Regulator. The Lead Regulators may waive the thirty (30) day period for Participating Regulators to execute this Agreement.

d. For purposes of this Agreement, an "Applicable Consent Order" shall be satisfactory to the Company if it: (i) incorporates by reference and

attaches via exhibit a copy of this Agreement, (ii) expressly adopts and agrees to the provisions of this Agreement, and (iii) includes only those other terms that may be legally required in the state of the applicable Participating Regulator. However, nothing in this Agreement shall be construed to require any state to execute and deliver an Applicable Consent Order if such state elects instead to sign this Agreement.

6. Within ninety (90) days of the Implementation Date, the Company will send a letter to the Plan Administrator of each ERISA-covered plan as to which any of the Companies provided group long term disability insurance coverage between January 1, 1997 and December 31, 1999, indicating that the Agreement is available on the Parent Company's website and making particular reference to Section B.2.b.

7. Time is of the essence in implementing the provisions of this Agreement, and the times specified may only be extended for good cause and with the advance written consent of the Lead Regulators, but such consent of the Lead Regulators shall not be unreasonably withheld.

8. A decision by the Lead Regulator in this Agreement means a decision that has been agreed to by all three of the Lead Regulators under this Agreement and substantially identical agreements referred to in the Recitals.

9. This Agreement shall remain in effect until the later of (i) January 1, 2007; (ii) the substantial completion of review by the Claim Reassessment Unit of claims for which review has been requested by Specified Claimants and Requesting Claimants and information needed for the review has been submitted on a timely basis; or (iii) the completion of the full re-examination referenced in paragraph C.2. Except as set forth in paragraph C.10 below, this Agreement and its provisions terminate for all purposes pursuant to this paragraph C.9.

10. Notwithstanding the termination of this Agreement to the extent provided in accordance with paragraph C.9 above:

(i) This Agreement shall survive as to the following provisions, which also individually survive: paragraphs -- B.2.b.3 (insofar as it relates to the consideration to be given Social Security disability awards); B.3.a (insofar as it establishes objectives for the Company's claim organization); B.3.b; B.3.c. (insofar as it establishes objectives for the Company's claim procedures); B.3.d; B.3.e; B.3.f; B.3.g. (insofar as it establishes objectives regarding evaluation of claims with co-morbid conditions); B.3.h (insofar as it confirms that claim personnel performance shall not be measured based on claim denial or termination targets or that claims will be closed based on termination or denial targets); B.3.l (insofar as it describes the content of a claim file).

(ii) The foregoing surviving obligations of the Company may only be amended by obtaining the consent of the Lead Regulators (acting in accordance with paragraph C.8), two-thirds of the Participating Regulators and the DOL, to any such amended provision: and,

(iii) Following termination of this Agreement for purposes of paragraph C.9 above, the Company will not materially change the claim procedures described in Exhibits 4, 5, 6 and 7 hereto unless (1) it first notifies the Lead Regulators and the DOL thirty days in advance of the proposed change and (2) the Lead Regulators and the DOL, within ten days of receipt of such notice, do not reasonably object.

11. Neither this Agreement nor any related negotiations, statements or court proceedings shall be offered by the Company, the Lead Regulator, the DOL or the Participating Regulators as evidence of or an admission, denial or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including but not limited to the Company, the Companies or the Parent Company, or as a waiver by the Company, the Companies or the Parent Company of any applicable defense, including without limitation any applicable statute of limitations or statute of frauds, except as set forth in B.2.d. of this Agreement.

12. The Company does not admit, deny or concede any actual or potential fault, wrongdoing or liability in connection with any facts or claims that have been or could have been alleged against it, but considers it desirable for this matter to be resolved because this Agreement will provide substantial benefits to the Company's present and former policyholders and insureds.

13. Neither this Agreement nor any of the relief to be offered under this Agreement shall be interpreted to alter in any way the contractual terms of any policy, or to constitute a novation of any policy. Neither this Agreement nor any relief to be offered under this Agreement shall be interpreted to reduce or increase any rights of participants in ERISA-covered plans, including but not limited to rights to which they may be entitled pursuant to ERISA 29 U.S.C. 1133, and 29 C.F.R. 2560.503-1, including any appeal or review rights under the plan. Other than those rights afforded under this Agreement, no additional rights are provided to the extent that any Specified Claimants or Requesting Claimants have previously exercised their rights as mentioned in this paragraph 13 (or have failed to exercise their rights and therefore, as provided for under ERISA, have permitted those rights to lapse).

14. The effectiveness of this Agreement is conditioned upon the following: (i) approval and execution of the Agreement by the Company, the Lead Regulators and the DOL, (ii) approval and execution of Agreement by appropriate documentation of no less than two-thirds of the Participating States unless a lesser number is agreed by the Company, (iii) approval and execution of substantially identical regulatory settlement agreements between each of the

other two insurance companies that come within the definition of Companies and their respective domiciliary regulators, and (iv) the approval and execution of a substantially identical regulatory settlement agreement between the New York subsidiary, the New York Superintendent of Insurance and the Lead Regulators.

15. During the pendency of this Agreement, each of the Participating Regulators agrees that such Participating Regulator and his or her insurance department (i) will not conduct a market conduct examination of the Companies relating to the Model Act, and (ii) will not impose a fine, injunction or any other remedy on any of the Companies for any of the matters that are the subject matter of this Agreement and may only participate on terms set forth in this Agreement in any fine or remedy that may be imposed under this Agreement . Notwithstanding the foregoing, upon notice from any Participating Regulator to the Lead Regulators, the Participating Regulator and the Lead Regulators shall proceed to investigate an assertion of the Company's non-compliance herewith regarding residents of said Participating Regulator's state.

16. This Agreement (or its Exhibits and their Attachments) may be amended by the Lead Regulators, the DOL and the Company without the consent of any Participating Regulator, provided that any such amendment does not materially alter this Agreement. Any amendment to the terms of the Agreement (or to its Exhibits and their Attachments) which would affect the regulatory authority of any Participating Regulators(s) shall not become effective without the consent of such Participating Regulator(s). All such amendments to this Agreement shall be in writing.

17. The DOL may enter into arrangements or agreements with any of the Lead Regulators or Participating Regulators pursuant to Section 506 of ERISA, 29 U.S.C. Section 1136, for cooperation, mutual assistance, or use by the DOL of facilities or services in connection with monitoring compliance with the Agreement and Title 1 of ERISA (including 29 C.F.R. Section 2560.503-1) and receiving reports on activities undertaken in connection with this Agreement. To the extent the Secretary enters into such an arrangement or agreement with any of the Lead Regulators or Participating Regulators, the Company shall provide reimbursement for any expenses incurred pursuant to C.3 of this Agreement.

18. For the duration of this Agreement, if any Lead Regulator or Participating Regulator finds any information which it believes constitutes a violation of ERISA with respect to any employee benefit plan, such regulator shall report that information to the DOL as soon as practicable.

**D. Remedies**

1. In the event that the Group fails to implement all of the changes in corporate governance provided for in paragraph B.1. of this Agreement within

the times specified in that paragraph, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured; provided, however, the Group will not be deemed to be non-compliant with the time requirements of paragraph B.1. if the Lead Regulators have not approved both of the candidates proposed by the Board of Directors to become new directors.

2. In the event that the Group fails to implement the Claim Reassessment Process provided for in paragraph B.2. of this Agreement within the times specified in that paragraph, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

3. In the event that the Group fails to provide the initial notice to Specified Claimants within the period set forth in Exhibit 1, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

4. In the event that the Group fails to implement the changes to the claim organization or the changes to the claim procedures provided for in paragraph B.3.a., paragraph B.3.c. or paragraph B.3.g. within the times specified therein, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

5. In the event that the Group fails to conduct the training provided for in paragraph B.3.h. within the time specified therein, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

6. Upon material completion of the Claim Reassessment Process, should the Lead Regulators upon examination determine that claim reassessment decisions were made in a manner inconsistent with the procedures of the Claim Reassessment Unit, the Group shall pay a fine of $145,000,000. The Group shall be deemed to be in compliance with the Handbook's maximum tolerance standard for claim procedures (presently 7%) unless the number of claim files with errors results in an error rate for either their collective subject *group* or *individual* claims hereunder that exceeds such maximum tolerance standard. Such error rates shall be determined by the Lead Regulators based on a review of statistically credible random separate samples of each of the *group* and *individual* claim reassessment decisions for the Group. A total fine of $145,000,000 shall be payable under this paragraph and/or paragraph D.7, but not both, in the event that the error rate exceeds the maximum tolerance standard for either or both of the *group* and/or *individual* claim samples. The Lead Regulators will use their best efforts to complete this determination by July 1, 2007.

7. Upon completion of the examination described in paragraph C.2, should the Lead Regulators determine that claims denied or benefits terminated after the Implementation Date did not meet the standard for compliance set forth in paragraph B.3.j, the Group shall pay a fine of $145,000,000. Such error rates shall be determined by the Lead Regulators based on review of a

statistically credible random separate sample of each of the *group* and *individual* subject claims denied or benefits terminated after the Implementation Date. A total fine of $145,000,000 shall be payable under this paragraph and/or paragraph D.6, but not both, in the event that the number of claim files with errors results in an error rate that exceeds the maximum tolerance standard for either or both of the *group* and/or *individual* claim samples. The Lead Regulators will use their best efforts to complete this examination by July 1, 2007.

8. The purpose of any fines imposed pursuant to paragraphs D.1 through D.5 is to encourage timely implementation of the matter set forth in each paragraph.

9. Within fifteen (15) days of being advised in writing by the Lead Regulators that the required two-thirds of Participating States have approved and consented to this Agreement (unless the Company consents to a lower number) and the other conditions of effectiveness set forth in paragraph C.14 having been satisfied, the Group shall pay to the Lead Regulators a fine of $15,000,000.

10. In addition to the other penalties applicable pursuant to this Agreement, and notwithstanding the error rate threshold, the Lead Regulators and Participating Regulators retain the right to impose any regulatory penalty otherwise available by law, including fines, with respect to the Company's willful violation of the terms of this Agreement or other violation of law.

11. The obligation, as among the individual Company members of the Group, to pay any such fines shall be equal to the proportional capital and surplus of each Company to the Group's obligation, such calculation to be based on the most recently filed NAIC financial statement of each such Company.

12. All fines paid under the foregoing subparagraphs shall be paid to the Lead Regulators and then allocated among the Lead Regulators and all Participating Regulators on the basis of the Company's premium volume for in-force policies of individual and group disability insurance as of December 31, 2003.

13. The Lead Regulators, the DOL and the Participating Regulators reserve the right to pursue any other remedy or remedies for violations of this Agreement. Nothing in this Agreement shall be construed to waive or limit the rights of the Lead Regulators, the DOL and the Participating Regulators to seek such other and additional remedies.

14. The enforcement of any fine imposed hereunder and the findings upon which any such fine are based shall be subject to judicial review as otherwise provided by law.

UNUM LIFE INSURANCE COMPANY OF AMERICA

BY:_____

ITS:_____

November ___, 2004

MAINE BUREAU OF INSURANCE

BY:_____
    Alessandro A. Iuppa, Superintendent

November ___, 2004

MASSACHUSETTS DIVISION OF INSURANCE

BY:_____
    Julianne M. Bowler,
    Commissioner

November ___, 2004

TENNESSEE DEPARTMENT OF COMMERCE
AND INSURANCE

BY:_____
    Paula A. Flowers, Commissioner

November ___, 2004

ELAINE L. CHAO
SECRETARY OF LABOR

ANN L. COOMBS
ASSISTANT SECRETARY
EMPLOYEE BENEFITS SECURITY ADMINISTRATION

BY:_____
    James M. Benages
    Regional Director
    Employee Benefits Security Administration

    November ___, 2004

Post Office Address:

U.S. Department of Labor
Employee Benefits Security Administration
JFK Federal Building, Room 575
Boston, MA 02203

TEL:(617)565-9600
FAX:(617)565-9666


**PARTICIPATING REGULATOR ADOPTION**

      On behalf of [Insert the State and Insurance Regulatory Agency], I, [Insert name of insurance regulatory official executing the Agreement], hereby adopt, agree and approve this Agreement.

[NAME OF INSURANCE REGULATORY AGENCY]

BY:_____

     [Title of Regulator]

     November ___, 2004